UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

FRANCES BOENSCH,

       Plaintiff,

v.

       Case Number 10-10120-BC
       Honorable Thomas L. Ludington

DELTA COLLEGE,

       Defendant.
_____ /

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Frances Boensch worked as an office professional for Defendant Delta College until June 30, 2009, when Defendant declined to renew her employment contract. On January 12, 2010, Plaintiff filed a four-count complaint against Defendant. Plaintiff contends that Defendant's decisions to suspend her employment, transfer her to a different department, and ultimately end her employment violated her Fourteenth Amendment rights to equal protection and due process. Plaintiff further contends that Defendant retaliated against her for reporting harassment, in violation of the Michigan Elliott-Larsen Civil Rights Act, and breached her employment contract.

On July 30, 2010, Defendant filed a motion for summary judgment [Dkt. # 13]. Defendant contends that all of Plaintiff's claims are barred by a six-month contractual statute of limitations, Plaintiff's constitutional claims are barred by Eleventh Amendment immunity, and all of Plaintiff's claims should be dismissed on the merits. Plaintiff did not file a timely response to the motion. Accordingly, on August 24, 2010, the Court issued an order to show cause directing Plaintiff to explain why the case should not be dismissed. The Court noted that it recently dismissed a case against Delta College on Eleventh Amendment grounds. *See Hall v. Delta College*, No. 09-10193-

BC (E.D. Mich. Dec. 15, 2009). At a September 15, 2010 status conference, the Court agreed to permit limited discovery on whether or not Defendant is entitled to Eleventh Amendment immunity as an "arm of the state," and provided a new response deadline for Plaintiff. The parties agreed that the initial briefs would be limited to whether or not the college could be sued in federal court.

After the deadline passed and Plaintiff had not filed a response, the Court entered a second order directing Plaintiff to show cause why the case should not be dismissed on January 5, 2011. On January 14, 2011, Plaintiff filed a brief explaining why changes in the factual circumstances surrounding Defendant's organization and budget suggest that Delta College should not be entitled to Eleventh Amendment immunity. Defendant filed a response on January 31, 2011. On February 15, 2011, the Court ordered Plaintiff to brief the other issues raised in Defendant's motion for summary judgment. Plaintiff's brief was filed on February 25, 2011, and the reply was received on March 4, 2011.

For the reasons explained below, Plaintiff has demonstrated that Defendant is not entitled to immunity under the Eleventh Amendment. Defendant's motion will still be granted, however, because Plaintiff did not file her civil rights action within six months of the date of her termination, as her contract and Michigan law required.

**I**

Plaintiff began working for Defendant in January 2004 as a part-time employee in the facilities management department. On August 22, 2005, she submitted an application for a full-time "office assistant" position. The application required that she provide her name, address, educational background, and work history. Defendant indicated in the application materials that Plaintiff would not be considered for employment unless she signed an acknowledgment, providing that the

information in the application was truthful, and authorizing an investigation into her employment history. The acknowledgment continued:

> I agree that any action or suit against Delta College arising out of my employment or termination of employment, including, but not limited to, claims arising under State or Federal civil rights statutes, must be brought within 180 days of the event giving rise to the claims or be forever barred. I waive any limitation periods to the contrary.
>
> **READ CAREFULLY BEFORE SIGNING**
>
> I agree that any claim or lawsuit relating to my service with Delta College or any of its divisions must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit. I waive any statute of limitations to the contrary.

[Dkt. # 13-26]. Plaintiff signed the acknowledgment and submitted the application. At the bottom of the final page, the application also included a disclaimer, which provided:

> This application is considered current only for the position applied for as listed on the front of this application. If you are still interested in other employment, it will be necessary for you to reapply by filling out a new application. A person with a disability or handicap requiring accommodation for completing the application process should notify Human Resources as soon as possible.

[Dkt. # 13-26]. Plaintiff's application was successful, and she began working as an "office assistant" in the human resources department in September 2005.

On May 11, 2006, Plaintiff submitted a second application for a full-time "Office Professional Equity / Human Resources" position. [Dkt. # 13-27]. The application again required Plaintiff's personal information, educational background, work history, references, and information about her job skills. The application included an identical acknowledgment, providing a six-month limitations period on all employment-related claims, and a disclaimer, noting that it would be considered current only for the listed position. Plaintiff's application was again successful, and she began working as a full-time Office Professional in the Human Resources and Equity Department

shortly afterward.

On June 26, 2007, Plaintiff signed a one-year employment contract with Delta College. The document was entitled "Support Staff Memorandum of Appointment." [Dkt. 13-2]. The contract was also signed by college president Jean Goodnow. It identified Plaintiff's position as "Support Staff," but it is undisputed that she continued in her position as an Office Professional in the Human Resources and Equity Department. The agreement provided that Plaintiff would be employed by the college from July 1, 2007 through June 30, 2008. It further indicated:

> Unless prohibited by law the college reserves the right not to extend or renew this contract of employment for any reason or no reason.
>
> The college reserves the sole right to determine which circumstances prove to be detrimental to the operation of the College justifying reprimand, suspension or dismissal during the period of this appointment.
>
> Any renewals or extensions of employment will only be by an additional written memorandum signed by the President. No representation by the college for employment beyond the expiration date of this memorandum is expressed or implied in this agreement.

[Dkt. # 13-2]. Plaintiff signed an identical employment contract one year later, on July 1, 2008, extending her employment as an Office Professional through June 30, 2009. [Dkt. # 13-1].

In late May or early June 2008, Plaintiff received a threatening e-mail while at work from Sarah McDonagh, a woman with whom she had been romantically involved. Pl.'s Dep. at 27. McDonagh apparently threatened to reveal private facts about their relationship to Plaintiff's friends and family members unless Plaintiff agreed to resume the romantic relationship. Plaintiff shared the e-mail with a Delta College Public Safety Officer, Liz Ward, who happened to be passing through the Human Resources Department when Plaintiff received the e-mail. Ward initiated an investigation, submitted a complaint to the Bay County Prosecutor, and a misdemeanor stalking

warrant was issued for McDonagh's arrest on June 10, 2008. [Dkt. # 13-4-B].

When the director of the college's public safety department, Mike Wiltse, learned of the warrant, he faxed a letter to assistant prosecutor Scott Gordon and asked that the warrant be withdrawn. [Dkt. # 13-4-A]. Wiltse also informed Gordon that the investigation would be handled by the Michigan State Police because Wiltse knew McDonagh through his position as a women's softball coach. Wiltse explained in an affidavit that he asked Gordon to withdraw the warrant because he believed Ward had not completed a thorough investigation and Ward did not follow "internal procedures for obtaining a warrant." [Dkt. # 13-4]. Gordon complied with Wiltse's request and withdrew the warrant. [Dkt. # 13-5].

Ward disputes Wiltse's assertions regarding the comprehensiveness of her investigation and her compliance with the "internal procedures for obtaining a warrant." Ward testified that McDonagh's e-mails and voice messages to Plaintiff, which are not part of the record in this case, were a sufficient predicate for a stalking charge. *See* Ward Dep.; [Dkt. 34-2]. She also testified that she followed the same procedures for obtaining the McDongah warrant as she followed for obtaining approximately twenty other warrants during her period of employment with Defendant. The McDonagh warrant was the only one that was questioned by Wiltse.

Ward resigned her employment with Defendant six months later, in December 2008. Ward testified that she was offered a choice: she could resign, with a positive letter of recommendation and uncontested unemployment benefits, or her employment would be terminated. *Id.* Ward believes that Defendant's decision was motivated by her involvement in the McDonagh matter. *Id.*

Near the time that Ward was investigating the McDonagh e-mail, Wiltse also interviewed Plaintiff. The interview occurred even though Plaintiff had avoided Wiltse during the process and

-5-

was uncomfortable talking to him about the situation. Pl.'s Dep. at 28–29. According to Plaintiff, Wiltse is "not professional" and had exhibited a "bias" toward women, which he demonstrated by commenting on Plaintiff's appearance in a way that made her uncomfortable. *Id.* During the interview, Wiltse apparently asked Plaintiff about her sexual orientation, and afterward, one of Plaintiff's supervisors directed her to disclose the fact that she is bisexual to her coworkers. Pl.'s Aff.; [Dkt. # 34-3]. Up until that time, Plaintiff had deliberately kept her sexual orientation private. Pl.'s Dep. at 141–43.

On June 23, 2008, Plaintiff sent an e-mail to Margarita Mosqueda, a supervisor in the Human Resources Department, contending that she had been sexually harassed by Mike Wiltse. [Dkt. # 13-6]. Plaintiff suggested that Wiltse would have handled the McDonagh situation differently if McDonagh were a man, and noted that, according to McDonagh, Wiltse deliberately intervened in the investigation to protect McDonagh. Defendant investigated the complaint, and informed Plaintiff that the college believed Wiltse's actions did not constitute harassment in a July 22, 2008 memorandum. [Dkt. # 13-7].

Meanwhile, on July 11, 2008, Scott Gordon, the prosecutor who had earlier requested a misdemeanor stalking warrant for McDonagh, filed a complaint in Bay County seeking a felony arrest warrant for Plaintiff. [Dkt. # 13-9]. Gordon alleged that Plaintiff violated Michigan's anti-cyberstalking law, which makes posting a message about another person on the Internet a felony if the poster knows or has reason to know (a) "posting the message could cause 2 or more separate noncontinuous acts of unconsented contact with the victim"; (b) "posting the message is intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested"; (c) a "reasonable person" would feel "terrorized, frightened, intimidated,

threatened, harassed, or molested" as a result of the conduct caused by the message; and (d) the victim did suffer "emotional distress and . . . feel terrorized, frightened, intimidated, threatened, harassed, or molested" as a result of the conduct caused by the message. Mich. Comp. Laws § 750.411s.

Plaintiff was arrested by Michigan State Police officer Liz Hunt while at work on July 14, 2008. Plaintiff was suspended with pay on August 5, 2008, for excessive personal use of the college's computers, in violation of the computer use policy. [Dkt. #13-10, -11, -12]. She also received a three-day unpaid suspension beginning August 21, 2008. She remained on paid suspension through September 12, 2008, when she was reassigned to a temporary position in the financial aid department. [Dkt. # 13-15]. Plaintiff viewed the transfer as a demotion because her level of responsibility was reduced and the college informed her that the position may not be continued beyond June 2009. On September 19, 2008, Plaintiff filed a grievance with the president of Delta College, Jean Goodnow. [Dkt. # 13-18]. Plaintiff grieved the decision to suspend her employment and then transfer her to the financial aid department, as well as Defendant's investigation into her sexual harassment complaint. Plaintiff also argued that Defendant should not have relied on the pending criminal case in reaching the decision to suspend and then transfer her employment because Plaintiff was not convicted and maintained that she was innocent of the charged conduct.

Goodnow rejected Plaintiff's grievance in an October 15, 2008 memorandum. [Dkt. # 13-25]. Goodnow emphasized that, according to Hunt, Plaintiff had been warned not to have further contact with McDonagh and to remove all postings concerning McDonagh from the Internet, or she may be charged with a crime. Goodnow relied on the information from Hunt despite repeated and

consistent denials from Plaintiff that she ever received such a warning. Goodnow also observed that there was no delay or other disparate treatment in Wiltse's handling of the McDonagh warrant that was attributable to Plaintiff's sex or sexual orientation. Goodnow noted that the transfer was necessary because the college had lost confidence in Plaintiff's ability to safeguard confidential information based on her misuse of the college's computers and the pending criminal charge. Goodnow concluded:

> I acknowledge your concern that your current position in Financial Aid, which has been maintained at the same level of compensation which you earned in your assignment with the Human Resources Department and Equity Office, may not be available after June 30, 2009. My review of this matter indicates that substantial efforts were made to find a vacant position within the College which was consistent with your skills and abilities and in which you would not have access to confidential information. Your current position is the only vacant position available which satisfies those criteria. As per college policies, you may apply for any internal postings which arise and will receive consideration consistent with those policies. Also, depending upon personnel assignments within the Financial Aid area, your current position may continue to be available after June 30th. Thus, I urge you to use your best efforts to succeed in your current position.

[Dkt. # 13-25].

On May 28, 2009, the Honorable William A. Caprathe dismissed the felony cyberstalking charge against Plaintiff with prejudice. [Dkt. # 34-6]. Judge Caprathe concluded that the Michigan anti-cyberstalking statute was unconstitutionally vague.

On June 4, 2009, Defendant informed Plaintiff that the college had hired a different person to fill the position of Office Professional in the financial aid department. In a memorandum, Defendant informed Plaintiff that she would be paid through June 30, 2009, the end of her one-year contract, but that her contract would not be renewed. [Dkt. # 34-14]. The decision to not renew Plaintiff's contract followed a favorable mid-year performance review from her supervisor in November 2008. [Dkt. # 34-15]. Her supervisor noted that she met or exceeded expectations in

every relevant category.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). If the opposing party does not raise genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

**III**

Defendant contends that it is immune from suit under the Eleventh Amendment. "The Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994); *see also Hans v. Louisiana*, 134 U.S. 1 (1890) (concluding that a federal court cannot entertain a suit against a state brought by a citizen of that state). Thus a federal lawsuit against an unconsenting state by a citizen of that state will generally be dismissed. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984).

Whether a particular suit is in fact a suit against a state, however, is often a difficult question. *Id.* The answer depends on whether the entity identified in the complaint is an "arm of the state" or a "political subdivision" of the state. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). A "political subdivision," a category that includes cities, counties, and local school boards, may be sued in federal court, *id.*, but an "arm of the state," a category that includes high-ranking state officials, state-level agencies, and many public colleges and universities, may not be sued in federal court, *see* Frank H. Julian, *The promise and Perils of Eleventh Amendment Immunity in Suits Against Public Colleges and Universities*, 36 S. Tex. L. Rev. 85, 96 n.54 (collecting cases). Community colleges, because they generally focus on serving a particular intrastate region, often present particularly close questions. In each case, the district court must engage in a fact specific inquiry into the unique circumstances of the defendant. *See Hall v. Med. Coll. of Ohio*, 742 F.2d 299, 302 (6th Cir. 1984) ("Each state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances." (citation and quotation marks omitted)).

Several courts have concluded that particular community colleges are political subdivisions that may be sued in federal court. *See, e.g.*, *Goss v. San Jacinto Junior Coll.*, 588 F.2d 96, 98–99 (5th Cir. 1979) (citing *Hander v. San Jacinto Junior Coll.*, 519 F.2d 273 (5th Cir. 1975), *aff'd on reh'g* 522 F.2d 204 (per curiam)); *see also Hostrop v. Bd. of Junior Coll. No. 515*, 523 F.2d 569, 577 n.3 (7th Cir. 1975) (noting state had waived any potential immunity for college). Other courts have reached the opposite conclusion in similar circumstances. *See, e.g.*, *Sturdevant v. Paulsen*, 218 F.3d 1160, 1170 (10th Cir. 2000) (Colorado Board of Community Colleges and Occupational Education entitled to immunity); *Hadley v. N. Ark. Comty. Coll.*, 76 F.3d 1437, 1442 (8th Cir. 1996). The Sixth Circuit has never addressed whether a Michigan community college is entitled to Eleventh Amendment immunity. *See McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 438 n.5 (6th Cir. 2006). Moreover, district courts that have considered the question have reached contradictory conclusions. *Compare United States ex. rel Diop v. Wayne Cnty. Comt. Coll. Dist.*, 242 F. Supp. 2d 497 (E.D. Mich. 2003) (concluding Wayne County Community College District is an "arm of the state" entitled to Eleventh Amendment immunity) *with Lansing Cmty. Coll. v. Nat'l Union Fire Ins. Co.*, 681 F. Supp. 2d 868 (W.D. Mich. 2010) (concluding Lansing Community College is not an "arm of the state" for purposes of diversity jurisdiction).

In *Diop*, the Honorable Gerald E. Rosen concluded that Wayne County Community College District ("WCCCD") was entitled to Eleventh Amendment immunity from an employment discrimination suit filed by a part-time chemistry professor. *Diop*, 242 F. Supp. 2d at 526–28. Judge Rosen emphasized that the Michigan Constitution requires the state legislature to provide for "the establishment and financial support of public community and junior colleges which shall be supervised and controlled by locally elected boards." Mich. Const. art. VIII, § 7. The constitution

-11-

also provides for an eight-member "state board of community colleges" to advise the state board of education on supervision, planning, and appropriations for the community college system. *Id.* Judge Rosen noted that in response to their constitutional obligation, the legislature passed the Community College Act of 1966, which, in more than one hundred separate sections, provides general regulations for organizing, creating, funding, and managing community colleges. Mich. Comp. Laws §§ 389.1–.195. Most importantly, Judge Rosen emphasized that approximately one-third of WCCCD's funding came from the state. As a result, "it is inescapable that any damage award would, by necessity, invade the state treasury, at least in part." *Diop*, 242 F. Supp. 2d at 527.

In *Lansing Community College*, by contrast, the Honorable Gordon Quist examined the factors for determining whether a particular entity is a "political subdivision" or "arm" of the state often employed by the Sixth Circuit. Specifically,

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (citations omitted); *see also Hall*, 742 F.2d at 302 (employing a detailed nine-point analysis). Judge Quist determined that each of the *Ernst* factors supported the conclusion that Lansing Community College is a "political subdivision" of the State of Michigan that is subject to suit in federal court. Because the same is true of the Defendant in this case, it too is a political subdivision of the State and subject to suit in this Court.

First, there is no evidence that the State would be saddled with "potential liability" if a judgment were to be entered against Delta College. *Ernst*, 427 F.3d at 359. Defendant suggests that

a judgment against the college would have the same "practical consequences" as a judgment against the State itself, and therefore, the State is "potentially liable." *See Pennhurst*, 465 U.S. at 124 n.34. The Defendant emphasizes that a judgment against the college would have some indirect impact on the State treasury—twenty percent of the college's 2010–2011 revenues are projected to come from the State. [Dkt. # 28-2].

Contrary to Defendant's assertions, however, the fact that some of the money used to pay a judgment would come from the State does not mean the State is potentially liable for the judgment. The Eleventh Amendment does not immunize an entity from suit in federal court simply because it "receives a significant amount of money from the State." *Mt. Healthy*, 429 U.S. at 280–81. The key question with regard to the first *Ernst* factor is whether a judgment against the defendant would function as a judgment against the state, not whether some state funds may be used to satisfy the judgment. In *Ernst*, for example, the issue was whether Michigan violated the equal protection clause by providing a more generous pension benefit for some state judges than others depending on the geographic location where the judge had served. In determining that the defendant officials were immune from suit in federal court, the Sixth Circuit emphasized that the State was obligated by statute to fully fund judicial pensions. Thus, if the pension board was unable to satisfy a judgment, the State would be obligated to do so. Here, by contrast, if Defendant were unable to pay a judgment against it, there is no evidence that the judgment would be collectible directly from the State or that the State would be obligated to provide the necessary funds to the college. *See also Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430–31 (1997) (emphasizing that the inquiry into potential legal liability is designed to provide insight into the "relationship between the State and its creation" and cautioning against a "formalistic question of ultimate financial responsibility.").

Notably, if every entity that received a portion of its funding from the State were immune from suit under the Eleventh Amendment, no city, county, school, or police force in Michigan would be subject to suit in federal court. For example, every judgment against the City of Saginaw, the largest city in the Northern Division of the Eastern District of Michigan, has an indirect impact on the State treasury. Indeed, a judgment against the City of Saginaw may impact the State treasury more significantly than a judgment against Delta College. As already discussed, about twenty percent of Delta College's 2010–2011 revenue came from the State. [Dkt. # 28-2]. More than twenty-eight percent of the City of Saginaw's 2008–2009 general fund revenue came from the State. *See* City of Saginaw, Michigan 2008/2009 Approved Budget at 24.[1] Accordingly, the first *Ernst* factor suggests that Defendant is subject to suit in this Court.

The second *Ernst* factor calls for an examination of State statutes and court decisions to determine how the State refers to the college and the level of control the State maintains over the college. As Judge Rosen explained in *Diop*, the State Legislature has the constitutional authority to establish a community college system in Michigan, and has enacted comprehensive legislation to establish and manage the system. 242 F. Supp. 2d at 526–28. But there is more to the story. While the legislature has general authority to establish and provide for the management of the community college system, a closer examination of the statute reveals that the legislature has elected to delegate much of the authority for the creation, management, and funding individual community colleges to local or regional authorities.

Community colleges are distinct entities which are managed by a regionally elected board

---

[1] The budget is available at: http://www.saginaw-mi.com/Government/Departments/Finance/FY%202009%20Adopted%20Budget.pdf

-14-

of trustees. Mich. Comp. Laws §§ 389.103(1), .54, .82–.83. Each board has expansive power to purchase land, erect buildings, borrow money, design a curriculum, establish tuition rates, hire administrators, professors, and staff, determine salaries, and even levy local taxes to support the college. Mich. Comp. Laws §§ 389.121–.145. Moreover, the State itself defines community colleges as "political subdivisions," like counties, cities, and local school districts. Mich. Comp. Laws § 691.1401(b) (defining terms for the purposes of a Michigan statute that limits governmental tort liability). Michigan law defines public colleges and universities, on the other hand, as part of the "State" itself. Mich. Comp. Laws § 691.1401(c). *See also Doan v. Kellogg Cmty. Coll.*, 263 N.W.2d 357, 360 (Mich. Ct. App. 1977) (concluding that the Michigan Court of Claims, a court established for resolution of claims against the State, lacks jurisdiction over suits against community colleges because, like cities, counties, and local school districts, they are not the State). Accordingly, the second *Ernst* factor also suggests that Defendant is a political subdivision of the State subject to suit in this Court.

The third *Ernst* factor, which asks whether state or local officials select the entity's board, also supports the conclusion that Defendant is not entitled to Eleventh Amendment immunity. As already discussed, a locally elected board of trustees, Mich. Comp. Laws §§ 389.103(1), .54, .82–.83, exercises substantial control over all aspects of Defendant's operations. While there is some oversight at the state level, the vast majority of day-to-day operations are controlled by the locally elected board.

The fourth *Ernst* factor asks whether the entity performs a state or local function. The Community College Act of 1966 defines "community college" as "an educational institution providing collegiate and noncollegiate level education primarily to individuals above the twelfth

-15-

grade age level within commuting distance." Mich. Comp. Laws § 389.105(c). Thus, the legislature intended community colleges to serve a local purpose—students within commuting distance—rather than a statewide purpose. Moreover, Defendant has embraced its local mission. The heading on the college's Web site emphasizes that it has been "Serving Mid-Michigan Since 1961." *See* http://www.delta.edu/aboutdelta.aspx. The welcome message from the college president also emphasizes its regional focus:

> We are proud of the fact that this institution is important to the economic well being of the region. Delta graduates are everywhere. Nurses, teachers, doctors, skilled tradesmen, business leaders, people just like you, who come to Delta with a dream to succeed in life. More than 86 percent of Delta graduates have stayed in Michigan, and more than 61 percent reside in the Tri-Counties.

*Id.* Thus, the fourth *Ernst* factor also supports the conclusion that Defendant is a political subdivision subject to suit in this Court.

Considering all the *Ernst* factors, Defendant is a "political subdivision" rather than an "arm" of the state. 427 F.3d at 359. Accordingly, Defendant is not entitled to Eleventh Amendment immunity.

**IV**

Defendant next contends that Plaintiff's complaint should be dismissed because her claims are barred by a contractual time limitation on such claims. On May 11, 2006, Plaintiff completed, signed, and submitted an application for a "office professional equity/human resources" position at the college. [Dkt. # 13-27]. The application was, in all relevant aspects, identical to an application she completed one year earlier for an "office assistant" position. [Dkt. # 13-26]. The applications contained a disclaimer just above the signature line, which provided in part:

> I agree that any action or suit against Delta College arising out of my employment or termination of employment, including, but not limited to, claims arising under

> State or Federal civil rights statutes, must be brought within 180 days of the event giving rise to the claims or be forever barred. I waive any limitation periods to the contrary.
>
> **READ CAREFULLY BEFORE SIGNING**
>
> I agree that any claim or lawsuit relating to my service with Delta College or any of its divisions must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit. I waive any statute of limitations to the contrary.

When the complaint was filed on January 12, 2010, more that six months had passed since the date that Plaintiff was suspended, the date that she was transferred to the financial aid department, the date that she was informed her contract would not be renewed, and the date that the contract expired. Accordingly, if the waiver was valid, her complaint must be dismissed because it was not filed within six months of any of the challenged actions.

Plaintiff first responds that the waiver is inapplicable following her transfer out of the human resources department because the application that contained the waiver also provided that it would be "considered current only for the position applied for as listed on the front of this application." [Dkt. # 13-27]. That is, because the application only entitled Plaintiff to consideration for a position in the human resources department, the six-month limitation period only applied to decisions that were made while she remained a human resources employee.

The language on which Plaintiff relies provides that an applicant interested in a position at Delta College will be required to submit a separate application for each position the applicant is interested in. Thus, when Plaintiff submitted the application for an Office Professional position in the human resource department, she was considered only for that position. She would have been required to submit a separate application if she were interested in a similar position in a different department. The statute of limitations waiver, by contrast, emphasizes that it applies to any dispute

about Plaintiff's "service with Delta College or any of its divisions." Thus, when Plaintiff submitted the application and was hired, she agreed that *any* dispute concerning her employment with *any* division of the college must be brought within six months. The waiver was not limited to disputes concerning her position in the human resources department.

Plaintiff also contends that the need for "uniformity" in § 1983 limitations periods means that the typical statute of limitations for § 1983 claims cannot be waived or decreased by contract. *See Wilson v. Garcia*, 471 U.S. 261, 275 (1985). Section 1983, like many federal statutes, does not contain a specific statute of limitations. *Bd. of Regents v. Tomanio*, 446 U.S. 478, 483 (1980); *see also* 28 U.S.C. § 1658 (creating a general four-year limitations period for statutes enacted after December 1, 1990). Accordingly, for remedial statutes enacted before December 1, 1990, like § 1983, the applicable limitations period is "borrowed" from "the state law of limitations governing an analogous cause of action." *Id.* at 484. In *Wilson v. Garcia*, the Supreme Court concluded that tort actions to recover for personal injury are the most analogous state actions to § 1983 claims. *Wilson*, 471 U.S. at 268–80. Thus, in each state, federal courts borrow the local statute of limitations as it applies to personal injury actions when considering whether a § 1983 claim is time barred.

Michigan law generally provides a three-year statute of limitations for actions to recover damages for personal injuries. Mich. Comp. Laws § 600.5805(10); *see Owens v. Okure*, 488 U.S. 235, 239–51 (1989) (concluding courts should employ the generally applicable limitations period for personal injury actions rather than a specific period governing personal injuries caused by intentional torts). Accordingly, Plaintiff would generally have had three years from the date of the challenged action to file her § 1983 claim. *See Bromley v. Mich. Educ. Ass'n-NEA*, 815 F. Supp. 220 (E.D. Mich. 1993). But as Defendant emphasizes, Michigan also permits parties to decrease

-18-

the length of the applicable statute of limitations by contract. *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 31 (Mich. 2005) ("[A]n unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy."); *Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471, 474 (Mich. Ct. App. 2005).

Plaintiff argues that the Michigan Supreme Court's permissive stance on contractually shortened statutes of limitations should not be applied to § 1983 claims because the United States Supreme Court has insisted on uniformity within each state for § 1983 limitations periods. *See Wilson*, 471 U.S. at 275. Contrary to Plaintiff's assertion, however, the importance of uniformity within Michigan is better served by permitting the parties to a contract to shorten the limitations period for a § 1983 claim in the same way the parties might contractually shorten the limitations period for a wide variety of other claims, including personal injury claims. *See Rory*, 703 N.W.2d at 28–29. By requiring "all" claims to be brought within six months, the parties to this case provided a specific time limitation on all employment related claims, as Michigan law permits. Plaintiff has not demonstrated a compelling reason to exempt § 1983 claims from that limitation.

Moreover, in *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 354–59 (6th Cir. 2004), the Sixth Circuit concluded that an identical six-month limitations period contained in an employment application could be applied to bar a Title VII claim. The Sixth Circuit emphasized that under Michigan law, an application for employment becomes a part of the employee's contract of employment. *Id.* at 356 (citing *Timko v. Oakwood Custom Coating, Inc.*, 625 N.W.2d 101, 106 (Mich. Ct. App. 2001); *Butzer v. Camelot Hall Convalescent Ctr., Inc.*, 454 N.W.2d 122, 124 (Mich. Ct. App. 1989)). The Court further concluded that a six-month limitations period was reasonable under federal law. *Thurman*, 397 F.3d at 357 (citing *Myers v. Western-Souther Life Ins. Co.*, 849

F.2d 259, 262 (6th Cir. 1988)). Plaintiff does not contend that § 1983 differs from Title VII in any way, nor does she argue that a six-month limitations period for a § 1983 claim is unreasonable.

In short, Plaintiff's claims are barred by the six-month limitations period she agreed to in her application for employment. Plaintiff has not advanced any evidence to suggest that the Court should ignore the requirement. This conclusion makes it unnecessary to consider Defendant's remaining arguments.

## V

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 13] is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint [Dkt. # 1] is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 30, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 30, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS